Good morning, Your Honor. May it please the Court. My name is Dan Pulsenberg, and I represent the appellant, John Prendeville. This is a case where Judge Quackenbush made several errors in ordering remittitor in this case, in a defamation lawsuit, where he ordered a new trial, a remittitor from $850,000 to $50,000. John Prendeville worked from October 1996 to March 1998 for Bovis, one of the defendants in this case. You know, we're familiar with the facts. Here's my problem. Your client waived special damages, right? He did. And special damages include things like lost earnings. That's true. So, you know, part of what you, you know, we try to sort of quantify what is this sort of loss of reputation, and one of the things you say in your brief is, well, you know, obviously when the jury starts here, you know, here's a guy who worked in the industry, in his sort of career in the industry, and he'll never go back and work there again because his name is dragged through the mud. But the jury can't consider that. That's loss of earnings. That's special damages. You waived those. So I don't know where that gets you. Well, the jury may not be able to consider how much he would have earned in that occupation as being lost wages. In fact, one of the issues that Judge Quackenbush took up is he's not going to allow in how much Mr. Prendeville makes now as a paralegal. Because that, if there were a wage loss claim, that would be an offset against the special damages. But the lack of the damage to reputation and self-image from not being able to work in your chosen profession, here John Prendeville was trained and employed as an intellectual engineer. And now, not to say that paralegals have a different, a lesser position in life, but he wanted to be an electrical engineer and now he has to be something else. If I... Well, no, no, I understand. There's a certain degree of self-esteem that goes with pursuing one's chosen profession. And, you know, even though you might say, you know, you could have become, you know, he started being an electrical engineer and he became governor, let's say. Well, no, I mean, people, you know, go on and become... As I understand, the governor now makes less than he used to make. Well, I'm just saying, let's say he gets a very, you know, he's sort of forced into a profession he doesn't want to be in and, you know, is financially successful, but he's unhappy about it because he really, you know, what he wants in life is to be an electrical engineer. I understand that. But then you can't look at his wages, you can't look at sort of his loss of earnings as an electrical engineer. You just have to somehow quantify what does a loss of the opportunity to practice your chosen profession, what is that worth? And the district court here said it's worth about $50,000, no more. No rational jury could come up with more than $50,000 for that. And in taking his guidance, it looked at a case that's somewhat similar, also from Nevada, that came up for $50,000. And I realize it was 20 years earlier, there was inflation and all that. But on the other hand, the guy had to give up being a politician. Well, let's remember the Allen case. Mr. Allen, the court points out, wasn't really much of a politician. He had never run for office before. I understand, but nevertheless, maybe that was his dream, and he wanted to be governor, and he didn't get to be governor, or senator, or whatever. People have their dreams, and I don't get into people's heads to second-guess their dreams. I don't see where Mr. Allen's dream of being a politician is any less deserving of respect than your client's becoming an electrician. I'll continue to be an electrician. The Allen case, though, there were a number of factors involved that distinguish this case from the Allen case. You guy isn't an electrician, right? He said he's a double-E, right? Exactly. He's an electrical engineer, not an electrician. A double-E can work for Southern Cal Edison, and a double-E can work for electronics companies. A double-E can do all kinds of things. And you're saying that he couldn't work as a double-E anywhere? In construction, he could not. Working more than I do. Construction in Las Vegas. Ah, so it's not that he can't work as an electrical engineer. It's that he cannot work, he cannot use his double-E degree in a construction company in Las Vegas. Right, which is what he wants to do. He lives in Las Vegas. So it's not that he's been foreclosed from his amazing profession of being a double-E, which is a pretty darn good profession, really. It is a good profession, and it's what he used to do. And he did work for Bovis in Europe on Euro Disney, but he would rather live in Southern Nevada. And so that's what he wants to do, and that's why he's taken up another profession in Southern Nevada. The Allen case is remarkably different, though, Judge Kaczynski. But one can live in Las Vegas and work in Los Angeles, and any number of people do. I realize it's not a reasonable life choice for everybody, but we live in an age of commuting marriages where a husband works on one coast and wife works on the other coast, and they meet in the middle or they visit each other. I mean, all sorts of things are happening. And these are all inferences that the jury could have drawn, but they didn't. They chose. We obviously understand that the jury evaluated this quite highly, the first jury did. But then along comes a district judge, and he says, Look, this is a case involving a limited public figure. It has circumstances and implications just like Allen. And to me, the most that this could have been worth was $50,000. And that's subject to an abusive discretion. And I think it was an abusive discretion. $50,000 is irrationally low in the 21st century. And it is based, and it's not based exclusively, but Judge Quackenbush admits that it's in conformity with and it's clear from the transcript that he relied on Allen. Besides being over 20 years old, Allen had to do with a media defendant, and Allen, and Your Honor, there is a mistake. Which in turn relied on Burnett, right? Right, and let me point out that in our brief, we say that the Nevada Supreme Court relied on the Court of Appeals decision in Burnett, and that is incorrect. What the Nevada Supreme Court did was rely on the Superior Court decision in Burnett, because the Court of Appeals decision came out a few months after the Supreme Court, and the Supreme Court in Allen pointed out that in the Carroll Burnett case, the Superior Court had reduced the damages down to $50,000 and found that to be convincing. But what Justice Springer points out in Allen is that the Superior Court, now he got the facts wrong, but it was central to his reasoning. The Superior Court in Burnett added, he says added, but that's not really true, $750,000 in punitive damages. So the total Superior Court decision in Burnett was $800,000. Now Judge Quackenbush and the appellee argue here that the jury must have been confused in making its compensatory damage decision, because it came up with $850,000, and then it was deadlocked in deciding how much should be involved in punitive damages. If the district court here had reduced, first of all, had reduced the compensatory damage award down to a certain amount, such as $400,000, and then said that another $450,000 would serve as punitive damages, we'd arrive at the same result in an acceptable way. But $50,000 is just an amount that is too low. It put the plaintiff in a Hobson's choice. There was no good result here. A reduction to completely $50,000 and nothing else beyond that. Didn't the district judge in effect say, look, it is like Allen in a sense. I'm not bound by Allen. I think the reasoning is good in Allen, but I'm not bound by it. He said, look, you know, the thing is he really hasn't shown anything to speak of, what the district judge thought. And $50,000 is fine. It's about what it came to, wasn't it? It is what it came to. But really, this jury had to be nuts, said the judge, to come up with that kind of number on the facts of this case, to come up with that kind of number. It must have been subject to passion, prejudice, et cetera, et cetera. I said nuts, passion, prejudice instead. And there's just no way to come up with that number in a rational way.  Right. And I think he ought to get something even if he didn't prove anything and that $50,000 looks like a pretty good number. That's about what happened, isn't it? That is about what happened. But it's still here are the problems with what I have with all those steps. Under Nevada substantive law, you cannot just determine passion and prejudice from the amount of the verdict. You have to show something that took place at trial that caused the passion and prejudice. Justice Rose, in his dissenting opinion in DeJesus, says the facts of the case cannot cause passion and prejudice under Nevada substantive law. Did the jury have to be nuts to come up with any amount over $50,000? No, they didn't. Clearly, this is a situation where the jury, the cases even that the defendant relies on, the Hershey chocolate case where the court reduced the amount from $1.2 million to $475,000, that would have been a more rational situation to put Mr. Prendeville in this case. If you have a situation where you either have to accept $50,000, which is an adequate number under the circumstances, or a completely new trial including a new trial on liability. Now, this is what, if the judge is saying that there is, that this verdict is against the weight of the evidence on the damages, he should not have awarded a new trial on liability and damages. You're going to have to cover the same ground in the second trial. You have to cover the same ground, but that doesn't mean that you have to. Probably do more. But that doesn't. Recognizing what happened in terms of the reduction. In other words, the evidence to support the greater amount would have to come in anyway. It's personally a retrial. But it's an unfair retrial because there was no. That's not what the rule says. That's not the test. Well, the test is if the damages and liability are inextricably intertwined so that the proof of the damages have to be considered in considering liability. We have the opposite situation here. Liability has been determined. All the cases that talk about don't try liability and damages separately don't talk about a case where you're simply ordering a new trial because of excessive damages. It really is not. What the judge was doing is saying either take an incredibly low amount compared to the verdict or risk taking nothing. A much more palatable choice would be as if the judge picked an amount that would be more reasonable in light of the verdict here. There are judgments. All the judgments that all the appellate court decisions that say that $50,000 is an appropriate amount are all from the 80s. Even the Nevada juries award more than that now. And even the Nevada Supreme Court is more tolerant of awards now. So really what the judge should have done is give a situation where he's looking at a certain amount well above $50,000 or a new trial just on damages. It really put John Prendeville in an unfair situation. Thank you, Your Honor. If I may reserve the balance of my time for rebuttal. Questions? We'll hear from the other side. Morning, Your Honors. My name is Terry Kerr from the firm of Hunterton Associates representing all the appellees here this morning. Judge Fernandez, you began your questioning talking about the Allen case. You've obviously read it thoroughly. I want to point out some of the distinctions in the Allen case and what happened in the case here. In the Allen case, you had people who testified as to the damages of the Allen plaintiff's reputation. You had a political consultant who testified that. The parties even agreed in the Allen case that the plaintiff's testimony itself established evidence of hurt feelings, shame, humiliation, and the like. You don't even have anything like that here. Mr. Prendeville didn't even say anything like that at trial. It was testimony in the Allen case about the number of people who were watching the live television debate, this political debate. There's no corresponding evidence in this case about the circulation of the newspaper. Judge Quackenbush was very careful to say, I'm picking $50,000 not because the Allen court picked $50,000. I'm following the reasoning of the Allen case. And having done that, I have concluded that $50,000 is the appropriate amount on remitter. As Judge Quackenbush points out, Nevada substantive law applies. You have to look at Allen. Mr. Polzenberg made reference to the other cases in the other jurisdictions. But the one thing you can look at those other cases and talk about and have a good discussion about proper amount of damages and defamation per se cases and that sort of thing. But those cases also discuss things like the jury's confusion between damages from termination and damages from defamation, for example, and the evidence presented by the plaintiff through the plaintiff's own testimony and the like. But ultimately, all of those cases are decided by the applicable State law. And in this case, that means the court has to look at Allen. And since the Allen case, there have been innumerable Nevada cases in defamation, slander per se, that have looked at the Allen case and nobody's ever suggested that it's outmoded, that it ought to be overturned or whatever. And maybe they don't always discuss amount of damages. But the Allen case is there, and it is still good law today. So, you know, you ask yourself, what did the jury do here? What exactly? How is it that you can have a plaintiff who says, I'm going to waive special damages, but the jury says, well, we'll give you $850,000 in compensatory, and then you have a judge who says, there's nothing to support the verdict of $850,000 in compensatory damages. We'll never know, but I think the judge is correct. What kind of thing could support a verdict as to the value of somebody's reputation? I mean, if a guy comes in and says, gee, I think my reputation is worth a million dollars, I mean, what exactly, how does one, if you get away from special damages, if you get away from earning power or mental distress or any of that stuff, medical bills or whatever, what kind of proof could you have? Well, I, if I could turn. Or, you know, to put the question, so conversely, why isn't this a matter for a jury, members of the community, to assess, you know, given their familiarity with the community and understanding of what something like this, somebody's reputation is worth in the community? It is an elusive, it is an elusive test, but I think if the Court would look at the language in the Brown and Williamson case, that's the tobacco case that came out of Chicago with the television anchorman, it talks about damages can be presumed, but substantial damages cannot be presumed. And that's what you have here. You have the $850,000 was substantial. I think Judge Quackenbush is saying I'll give you something, but owing to the lack of evidence of anything, as you just suggested, Judge Kaczynski, anything that goes to that, it just can't rise above it. Let's say he got on the stand and said, yeah, you know, I think my reputation is worth $2 million. Let's say he'd said that. Would that be good enough? I don't think so, Your Honor. I don't think so. Not at all. What else could he have? Would you hire an expert to say, gee, I think reputation, what's your reputation worth? I mean, could you bring proof? I mean, you have a certain standing in the community. You understand you have a certain concept of your self-worth, and, you know, you probably could come up with a figure in your own mind, but my guess is if you took your five closest friends and put them in a room separately from each other and said, you know, what is, I'm sorry, what's your name? Mr. Kare, Your Honor. Kare? Kare, like care bearer, care package. You'll find his reputation. That's right. What Mr. Kare's reputation was, my guess is your five closest friends wouldn't come very close to each other. They'd come up with wildly different figures. I'm sure all of them very high. No, no, I'm very well deserved, but it's such an elusive concept. I'm not sure how, you know, why the judgment of one judge from out of state is better than the judgment of, what, six jurors or eight jurors? How many jurors were there in this case in the first trial? Eight jurors probably, right? Coming up to a unanimous verdict. Why isn't that better? Why isn't that at least as good? The, Mr. Printable, for example, what he could have done if he'd chosen to do it was bring people into the courtroom to testify about how they thought less of him or people who had decided, in fact, people who had said, setting aside for a moment the issue of special damages, if he'd brought anybody in who he had done a job interview with who had said, we would have hired him but for the fact that we feel after we read this newspaper article, we just couldn't because, you know, whatever. He's an extortionist. He's a criminal if they took that literally. Something has to be paraded before the jury. They can't just pull the figure out of thin air. I guess what you're saying, and correct me if I'm wrong, is essentially this would have supported, the record here would have supported a JNLV for zero damages. So the trial's court has simply said the jury's come up with $850,000. I find no support for that, and therefore I'm going to enter judgment for $0 in damages. That would have been supported, and so what the judge did here was something less than that, something less drastic and says, you know, I'll give him $50,000, even though it's not supported by the evidence. Is that the chain of reasoning? I think it is, Your Honor. In fact, the records will indicate we moved for judgment NOV on this case, and the judge actually said, came back the next day and said it's a closed call, but allowed the trial to continue. And then we got the verdict and he remitted $50,000. Okay. Thank you. Thank you, Your Honor. We have a little time left.  I said thank you to you. Thank you. Thank you for not talking to opposing counsel. Mr. Forsberg, you have a little time left if you want to take it. Thank you, Judge Kuczynski. Your Honor, your question about JNOV, I think, is an important question. There isn't a case here for judgment as a matter of law. There couldn't be, but that's really, I think, where the judge was confusing the substantial evidence test, the sufficiency of the evidence test, with the weight of the evidence test. Well, what was the evidence that he had any loss of reputation at all? In fact, during the case in chief, there was very, during the plaintiff's direct testimony, there was very little. But as SAC on defamation points out, a plaintiff doesn't have to present anything on a slander per se case. That's SAC on defamation, section 10.3.3. I see, because this is defamation per se. Exactly. Slander per se because it impugns his trade or profession, his competency within his trade or profession, and accuses him of a crime. Judge Quackenbush had no problem with that and agreed it was slander per se. That in itself would be sufficient for a case of damages to go to a jury. A jury understands what humiliation, lack of reputation, shock, all those elements are. A jury can determine what that is. Now, what Judge Quackenbush said is he didn't go further than that. On direct testimony, or excuse me, on cross-examination, he did go into that he was shunned by employers, that he was, that he had lost every friend he had at the time, if you could call them friends. He talked about a vice president of Hilton calling him on the phone and saying, what's going on down there? And he says, well, would you give me a job? And he never heard back. Now, what the judge said, so there was evidence of what happened to Mr. Prendeville. Judge Quackenbush said there should have been more. There should have been, he should have presented testimony about, and we just heard Mr. Carebear, excuse me, Mr. Care say that, I apologize, Terry, say that he could have presented, he could have brought in people to say, here's what, here's how I changed my opinion of him. Here's, I was going to offer him a job, but I didn't because of this. That goes to the height and the depth and the breadth of the evidence, but not to the sufficiency of the evidence. Yeah, but $850,000 is pretty wide, pretty deep. It's. That's not geography. You can't presume that. But it's not. It's one thing to say, look, you don't have to present evidence of actual loss to get to a jillion damages. It's another thing to say they can go berserk and avoid anything at all. But I don't think $850,000 is berserk. I don't think the case law demonstrates that it's berserk. In the millions it's berserk. We cite cases where they take, where courts have taken multimillion-dollar awards and reduced them to one million. I think $850,000 is within the acceptable realm. Look what Judge Quackenbush did, though. He compared, when he was looking at the weight of the evidence, he compared it to evidence. He said, well, there were certain evidence I didn't bring in, evidence of his protest activities, evidence of what he's making as a paralegal. If I had admitted all those, the jury would have awarded less. When he was weighing the evidence, he was weighing the evidence that went to the jury against evidence that was not admitted. Now, that's not an appropriate thing to do. It's obvious this judge would have awarded less, but it wasn't from the weight of the evidence. He was substituting his judgment for the judgment that the jury drew. And I must emphasize again, it is not just what Judge Quackenbush did in saying there should be remittitor. It is remittitor down to $50,000. There's no way that John could accept $50,000. That put John in a situation where to preserve his appeal on remittitor, on the remittitor issue, he had to go through another trial and face losing everything. Now, Judge Quackenbush even himself brought up the idea of certifying the issue under 1292B, but then decided that 1292B did not apply. So the only way that John could get a review of whether remittitor down to $50,000 was appropriate is to risk losing even that. So I think there were a number of factors here. First of all, remember, we don't have, in slander per se cases, we don't have the kind of proof that Judge Quackenbush is talking about and that Mr. Kerr is talking about. That's why we presume damages. We are not going to be able to get witnesses to come in and say, oh, yeah, when I found out about this, I didn't offer him a job. There's too much exposure for a witness to do that. That's why we presume damages in a case like this. Was there enough evidence to show damages here? I think that there was. The kind of proof that Mr. Excuse me, that Judge Quackenbush is asking for would have made a $10 million case as opposed to an $850,000 case. Were the damages affected by the acts that the defendant did? Of course they were. Was there a punitive component to it? There may be a slight punitive component, but that's why Judge Quackenbush should have taken that into account. Remitteder, after he declared a mistrial on the punitive damage phase, remitteder should have taken into account that there was that punitive damage function in there. He could have reduced the amount down to $475,000, the exact amount in the Bippas case, the Hershey-Chocolate case that the defendants rely on, and then he could have allowed the additional roughly $400,000. So the remedy you're seeking is reinstatement of the original jury's verdict? Yes. Or in the alternative, a remitteder that makes much more sense than $50,000. Do we have the authority at this point particularly to enter, to order a remitteder? That is certainly questionable. I think it's very fancy appellate judging that would allow us to do that. It's probably a little too lawyer-like for appellate judges. But look at the situation that John found himself in. If he could have brought the issue up under 1292B, the court could have reviewed it at that point. Yeah, we would have mistaken it. Very good. I mean, I'm just guessing, but that's exactly the kind of case we turned down for the reasons that Judge Quackenbush decided ultimately not to. Very good. Thank you, Your Honor. Thank you, Counsel. Case decided. We'll stand for a minute. I believe that's a lot.
judges: Kozinski, Beezer, Fernandez